USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/3/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

14-MD-2543 (JMF)
14-MC-2543 (JMF)

*This Document Relates To All Actions*

OPINION AND ORDER

-------------------------------------------------------------------------------x

JESSE M. FURMAN, United States District Judge:

**[Regarding New GM's Partial Motion for Summary Judgment on Plaintiffs'
Successor Liability Claims in the Fourth Amended Consolidated Complaint]**

This multidistrict litigation ("MDL"), general familiarity with which is assumed, arose from the recall in February 2014 by General Motors LLC ("New GM") of vehicles that had been manufactured by New GM's predecessor, General Motors Company ("Old GM"), with a defective ignition switch. Following that recall, New GM recalled millions of other vehicles, some for ignition switch-related defects and some for other defects. In this litigation, Plaintiffs seek recovery on behalf of a broad putative class of GM car owners and lessors whose vehicles were subject to those recalls, arguing that they have been harmed by, among other things, a drop in their vehicles' value due to the ignition switch defect and other defects. Their operative complaint — the Fourth Amended Consolidated Complaint or "FACC" — runs to over 1700 pages and 7500 paragraphs, and includes claims under state law brought by named Plaintiffs in all fifty states and the District of Columbia. (Docket No. 3356 ("FACC")).

In prior opinions addressing partial motions to dismiss filed by New GM, the Court has ruled on the viability of Plaintiffs' claims under federal law and the law of sixteen jurisdictions. *See In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2017 WL 2839154, at *2 (S.D.N.Y. June 30, 2017); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543

(JMF), 2016 WL 3920353, at *3 (S.D.N.Y. July 15, 2016). New GM now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment on "successor liability" claims brought by a subset of Plaintiffs — namely, "[a]ll persons who bought or leased a Delta Ignition Switch Vehicle on or before July 9, 2009" — in the sixteen jurisdictions that were addressed in the Court's prior opinions. (FACC ¶ 973). These claims were included in the FACC filed on September 15, 2016, in the wake of a ruling by the United States Court of Appeals for the Second Circuit that the relevant Plaintiffs are not barred from bringing claims against New GM by the terms of the order authorizing the sale, pursuant to Section 363 of the Bankruptcy Code, of most assets of Old GM to New GM. *See In Matter of Motors Liquidation Co.,* 829 F.3d 135, 163-66 (2d Cir. 2016). In its present motion, New GM argues that Plaintiffs' successor liability claims fail as a matter of non-bankruptcy law.

Relying primarily on a recent Second Circuit decision, New GM argues first that Plaintiffs' successor liability claims fail because they were property of Old GM's bankruptcy estate. In the alternative, New GM contends that Plaintiffs' claims fail under applicable state law. For the reasons that follow, the Court rejects New GM's threshold argument, and concludes that Plaintiffs are not barred by Old GM's bankruptcy from pursuing their successor liability claims against New GM because they did not receive constitutionally adequate notice of their claims in or before the bankruptcy. Resolving New GM's alternative arguments is a more complicated task, as it requires the Court to decide in the first instance what choice-of-law rules apply to Plaintiffs' claims and, then using those rules, to decide what substantive law applies — an exercise that requires the Court to examine the choice-of-law rules in each individual jurisdiction. For reasons the Court will explain, it concludes, based on that exhaustive analysis, that Delaware law applies in seven of the sixteen jurisdictions at issue here and further that,

under Delaware law, Plaintiffs' successor liability claims plainly fail as a matter of law. The Court declines to resolve the merits of New GM's motion with respect to the other nine jurisdictions, however, finding that additional briefing is warranted. In short, the Court grants New GM's motion for summary judgment in part and reserves judgment in part.

## BACKGROUND

The background of these MDL proceedings and what prompted them are described in the Court's two earlier opinions addressing New GM's partial motions to dismiss and will not be repeated here. *See In re: Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 2839154, at *2-3; *In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *3-4. The following facts, taken from the FACC and admissible materials submitted in connection with the pending motions, are either undisputed or described in the light most favorable to Plaintiffs. *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

In June 2009, after a period of prolonged financial instability and negotiations with the United States Government, Old GM filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York. *See Motors Liquidation Co.*, 829 F.3d at 143-45. (*See also* FACC ¶ 896; Docket No. 3517 ("Def.'s 56.1 SUF") ¶¶ 1-17). On July 10, 2009, the Bankruptcy Court entered an order (the "Sale Order") approving the sale of most of Old GM's assets to Vehicle Acquisitions Holdings LLC — a corporate entity sponsored by the U.S. Treasury and incorporated for the purpose of acquiring Old GM's assets — pursuant to Section 363 of the Bankruptcy Code. (Def.'s 56.1 SUF ¶¶ 20-22). Pursuant to the Sale Order, New GM — created and initially operated by Vehicle Acquisitions Holdings LLC — acquired

most of the assets of Old GM, and only certain specified liabilities. (*Id.* ¶ 31, 38-40).[1] The Sale

Order provided that New GM acquired Old GM's assets "free and clear" of other Old GM

liabilities, including "rights or claims based on any successor or transferee liability." *Motors*

*Liquidation Co.,* 829 F.3d at 146.

After the Sale, New GM was owned by four entities in the following percentages: 60.8%

by the U.S. Government, 11.7% by the Canadian Government, 17.5% by a new employees'

beneficiary association trust, and 10% by the bankruptcy estate of Old GM. (Def.'s 56.1 SUF

¶ 26). Old GM, under the new name of Motors Liquidation Company ("MLC"), retained sixteen

categories of assets and the liabilities that had not been expressly assumed by New GM in the

Sale. (*Id.* ¶¶ 31, 38-40). In accordance with the Chapter 11 liquidation plan, MLC was

dissolved on December 15, 2011; the MLC General Unsecured Creditors Trust (the "GUC

Trust"), funded by certain Old GM assets, assumed MLC's liabilities "within the meaning of

Section 1145(a) of the Bankruptcy Code." (*Id.* ¶ 45; Docket No. 3619 ("Pls.'

Counterstatement"), ¶ 45; Docket No. 3618 ("Pls.' 56.1 SUF") ¶ 30). The Bankruptcy Court

ordered that creditors with unsecured claims against Old GM could file claims against the GUC

Trust until early February 2012. *See In re Motors Liquidation Co.*, 529 B.R. 510, 537 (Bankr.

S.D.N.Y. 2015), *aff'd in part, vacated in part, rev'd in part sub nom. In Matter of Motors*

*Liquidation Co.*, 829 F.3d 135, *cert. denied sub nom. Gen. Motors LLC v. Elliott*, 137 S. Ct.

1813 (2017). After that bar date, no further claims were allowed except for those that amended a

---

[1] The liabilities expressly assumed by New GM include claims brought by Old GM vehicle owners on the basis of: (1) post-sale accidents involving Old GM vehicles causing personal injury, loss of life, or property damage; (2) repairs or the replacement of parts provided for under what is known as the "glove box warranty"; (3) "Lemon Law" violations; and (4) recall obligations relating to Old GM vehicles. (*Id.* ¶ 61).

prior claim, were filed with the GUC Trust's consent, or were deemed timely filed by the Bankruptcy Court. *See id.*

In April 2014, a group of plaintiffs (asserting, among other claims, economic losses arising from the ignition switch defect in Old GM vehicles), initiated an adversary proceeding against New GM in Bankruptcy Court. *See id.* at 538. On the same day, New GM moved to enforce the "free and clear" provision of the Sale Order to enjoin those claims. *See id.* at 538-39. In April 2015, the Bankruptcy Court held that the plaintiffs were entitled to actual notice of the 2009 Sale — as opposed to the notice by publication that had been issued — because the ignition switch claims were known to, or reasonably ascertainable by, Old GM. *See id.* at 556-60. But Judge Gerber also found that the plaintiffs had not been prejudiced by the lack of such notice and, thus, that New GM could not be sued for claims that otherwise could have been brought only against Old GM (apart from those arising from New GM's own wrongful conduct). *See id.* at 560-74. Finally, to the extent relevant here, the Bankruptcy Court found that any claims the plaintiffs could try to assert against the GUC Trust were equitably moot. *Id.* at 583-92. On appeal, the Second Circuit largely reversed. It agreed that Old GM violated the due process rights of certain ignition switch defect plaintiffs by not providing them with direct notice, but concluded that the plaintiffs were prejudiced by that violation. *In Matter of Motors Liquidation Co.*, 829 F.3d at 163-66. Accordingly, it vacated the Bankruptcy Court's decision to enjoin those plaintiffs' ignition switch defect claims, and remanded for further proceedings. *Id.* at 166. It also vacated the Bankruptcy Court's ruling on equitable mootness as impermissibly advisory because the plaintiffs had never sought relief from the GUC Trust. *Id.* at 168-70.

In the wake of that ruling, Plaintiffs in the MDL filed the FACC. To the extent relevant here, the FACC includes claims brought by Plaintiffs who purchased or leased "Old GM Delta

Ignition Switch Vehicles" (namely, 2005-2010 model year Chevrolet Cobalts, 2006-2011 model year Chevrolet HHRs, 2007-2010 model year Pontiac G5s, 2007-2010 model year Saturn Skys, 2003-2007 model year Saturn Ions, and 2006-2010 model year Pontiac Solstices) prior to entry of the Sale Order. (FACC, at 2). They seek, under the laws of all fifty states and the District of Columbia, to hold New GM liable as the successor to Old GM's unsecured debts. (FACC ¶¶ 973-974). More specifically, they bring claims relating to the ignition switch in the Delta Ignition Switch Vehicles — a switch that suffered from a defect (discussed at length elsewhere) that allowed it to move too easily from the "run" position to the "accessory" and "off" positions, causing moving stalls and disabling critical safety systems (such as the airbag). *See In re: Gen. Motors LLC Ignition Switch Litig*., 2016 WL 3920353, at *1. They claim that New GM should be held liable for various statutory and common law torts committed by Old GM because New GM is "the mere continuation or reincarnation of the same business enterprise as Old GM." (FACC ¶ 901; *see also* Docket No. 3633, at 1 & n.4 (stating that Plaintiffs are proceeding on a "*de facto* merger" theory with respect to claims in four states)).

As noted, New GM now moves for summary judgment on Plaintiffs' subset of successor liability claims. Pursuant to a prior order of the Court, New GM's motion is limited to successor liability claims brought by Plaintiffs named in the FACC from the sixteen jurisdictions that the Court addressed in its prior opinions on New GM's motions to dismiss: Alabama, California, the District of Columbia, Florida, Illinois, Louisiana, Maryland, Massachusetts, Michigan, Missouri, New York, Oklahoma, Pennsylvania, Texas, Virginia, and Wisconsin. (*See* Docket No. 3428; FACC ¶¶ 1234-7507). Since the motion became fully briefed, Plaintiffs have advised the Court (and the Bankruptcy Court) that they anticipate a settlement between the GUC Trust and

Plaintiffs who have filed a motion to bring late-filed claims against the GUC Trust pursuant to the Second Circuit decision.  (*See* Docket No. 4275).

## LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

## DISCUSSION

To address New GM's motion, the Court must cover a lot of ground. The Court begins with New GM's threshold argument that all of Plaintiffs' successor liability claims fail as a matter of law because they belong (or belonged) to the Old GM bankruptcy estate. After rejecting that argument, the Court turns to the next threshold issue: what choice-of-law rules apply. After concluding that the Court must — contrary to New GM's arguments — look to the choice-of-law rules of each individual jurisdiction at issue in this motion, the Court engages in that state-by-state analysis and concludes that Delaware law applies in seven of the sixteen jurisdictions. Finally, the Court examines the merits of New GM's arguments under Delaware law, and explains why additional briefing is warranted as to the laws of the other states at issue.

### A. *Tronox, Inc.*

As a threshold matter, New GM argues that all of Plaintiffs' successor liability claims fail as a matter of law in light of the Second Circuit's recent decision in *In re Tronox Inc.*, 855 F.3d 84 (2d Cir. 2017). In *Tronox*, several thousand plaintiffs (referred to as the "Avoca Plaintiffs" for reasons that are not relevant here) brought toxic tort claims in state court against several entities for injuries allegedly caused by the operation of a wood treatment plant in Pennsylvania. *See id.* at 90. Two of the entities that owned and operated the plant (the "Tronox debtors") subsequently filed for bankruptcy, and a "spinoff" corporation — Kerr-McGee Corporation

("New Kerr-McGee") — took ownership of their more profitable assets. *Id.* at 91. In the course of the bankruptcy proceedings, the Tronox debtors brought fraudulent conveyance claims against New Kerr-McGee to recover assets to satisfy their liabilities. *Id.* The Tronox debtors and New Kerr-McGee eventually settled, and the bankruptcy court entered an injunction barring claims against New Kerr-McGee that were "derivative or duplicative" of the Tronox debtors' claims. *Id.* at 88, 92, 111. Thereafter, the Avoca Plaintiffs sought to revive their toxic tort claims, and named New Kerr-McGee as a defendant under alter-ego and veil-piercing theories. *Id.* at 92-93. The district court found that the claims were barred by the injunction, and dismissed them with prejudice. *Id.* at 93-94. On appeal, the Second Circuit affirmed, holding that the Avoca Plaintiffs' successor liability claims were "generalized, derivative claims comprising estate property." *Id.* at 107.

New GM's argument that Plaintiffs' claims fail in light of *Tronox* is not without force. It is black letter law that creditors of a debtor lack standing to assert claims that are property of the bankruptcy estate. *See, e.g.*, *Tronox*, 855 F.3d at 106; *see also, e.g.*, *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 696 (2d Cir. 1989). And there is broad language in *Tronox* suggesting that where, as here, plaintiffs bring claims against a debtor's successor based on a theory of successor liability, those claims — even if premised on an underlying tort committed by the debtor — belong to the bankruptcy estate because the facts necessary to prove successor liability are available to any creditor and establishing successor liability would benefit all creditors. "The critical distinction between the underlying tort claim against the Tronox debtors and the alter-ego claim against New Kerr-McGee," the Second Circuit explained, "is that establishing the former would benefit only the Avoca Plaintiffs as individual creditors, whereas establishing the latter — that New Kerr-McGee is the alter ego of the relevant Tronox debtors

and should therefore be charged with all its liabilities — would benefit all creditors of the Tronox debtors generally." 855 F.3d at 107. "The facts necessary to prove that the Tronox debtors committed the underlying torts may be particular to the Avoca Plaintiffs, but the facts necessary to impute that liability to New Kerr-McGee 'would be . . . generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors.'" *Id.* (quoting *In re Emoral, Inc.*, 740 F.3d 875, 881 (3d Cir. 2014)).

That said, the facts of this case are different from the facts in *Tronox* — and in *Emoral* and the other cases upon which *Tronox* relied — in one critical respect: Whereas the plaintiffs in *Tronox* knew about (indeed, had brought) their underlying claims against the Tronox debtors before the latter filed for bankruptcy, Plaintiffs here did not know about their underlying claims prior to Old GM's bankruptcy. What is more, they did not know about their underlying claims because, as the Second Circuit has confirmed, Old GM deprived Plaintiffs of their constitutional rights to notice and an opportunity to be heard. *See Motors Liquidation Co.,* 829 F.3d at 159-61. In these circumstances, it cannot be said that a "recovery would serve to increase the pool of assets available to all creditors." *Tronox*, 855 F.3d at 107 (internal quotation marks omitted). Nor can it be said that a "win by [Plaintiffs] would be a win by [some creditors] to the detriment of the others." *Id.* at 104. After all, with the exception of creditors who have established a due process violation — at this point, only the Plaintiffs here — the creditors of Old GM are barred by the Sale Order from bringing successor liability claims against New GM. *See In re General Motors Corp.*, 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) ("[T]he Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction.").

10

In fact, where, as here, the party asserting a successor liability claim could not have asserted that claim at the time of a bankruptcy because the debtor (and debtor-in-possession) failed to give constitutionally adequate notice, it would be unreasonable to treat the claim as property of the bankruptcy estate, extinguished by the bankruptcy. For one thing, doing so would effectively render the due process rights of creditors worthless, as creditors deprived of the notice to which they were entitled would likely find themselves with no one to sue. It would also create perverse incentives and results. For instance, it would create an incentive for the bankruptcy trustee (or other creditors) to assert a free-floating successor liability claim (if such a thing exists) against an asset purchaser in every case, on the off chance that claims later come to light that could have been asserted against the debtor (and, by extension, against the asset purchaser on a successor liability theory). And, even more troubling, it would reward debtors and asset purchasers who concealed claims known to them but unknown to potential claimants, undermining a "cornerstone" of bankruptcy law. *See, e.g.*, *In re Savage Indus., Inc.*, 43 F.3d 714, 720 (1st Cir. 1994) ("Notice is the cornerstone underpinning bankruptcy code procedure. . . . Under the Code . . . the debtor in possession or trustee must ensure 'parties in interest' adequate notice and opportunity to be heard *before* their interests may be adversely affected."). At best, the result would be a windfall for asset purchasers such as New GM; they would escape liability, with no attendant benefit to any creditor of the debtor.

Thus, absent more explicit guidance from the Second Circuit, the Court concludes that, its broad language notwithstanding, *Tronox* should not be read to apply where, as here, the party asserting a claim did not bring, and could not have brought, that claim prior to the bankruptcy. Notably, that result is consistent with decisions by other courts holding that a non-debtor plaintiff's successor liability claim against the debtor's asset purchaser is not extinguished by a

Section 363 sale where the plaintiff did not receive constitutionally adequate notice. *See id.* at 720-23; *Moore v. Gulf Atl. Packaging Corp.*, No. 16-CV-886 (PK), 2016 WL 8231142, at *17-18 (D. Or. Nov. 29, 2016); *Schwinn Cycling & Fitness Inc. v. Benonis*, 217 B.R. 790, 796-97 (N.D. Ill. 1997); *In re Fairchild Aircraft Corp.*, 184 B.R. 910, 927-29 (Bankr. W.D. Tex. 1995), *vacated as moot on equitable grounds*, 220 B.R. 909 (Bankr. W.D. Tex. 1998); *see also, e.g.*, *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir. 1994) (holding that the bankruptcy court lacked jurisdiction to enjoin a post-confirmation products liability suit against the Chapter 11 debtor's successor). Indeed, as one court observed, "in all the cited opinions that precluded successor liability claims against asset purchasers in bankruptcy, the claimants were in front of the bankruptcy court during the bankruptcy proceedings, or the court found that the claimants should have brought their claims during the bankruptcy proceedings." *Ninth Ave. Remedial Grp. v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (N.D. Ind. 1996) (citing cases).

Significantly, the Court's conclusion is bolstered — if not confirmed — by the Second Circuit's decision holding that Plaintiffs here may pursue their claims notwithstanding the Sale Order. *See In Matter of Motors Liquidation Co.*, 829 F.3d at 163-66. Before the Bankruptcy Court, New GM explicitly relied on the Third Circuit's decision in *Emoral* to argue that Plaintiffs' claims were property of the bankruptcy estate and thus barred by the Sale Order. (*See* Docket Nos. 3914-1, 3914-2). Judge Gerber, however, rejected New GM's argument. *See In re Motors Liquidation*, 529 B.R. at 554-55 (stressing, among other things, that "none" of the cases upon which New GM relied, including *Emoral*, "involved a 363 sale, nor considered the rights of plaintiffs to be heard before a free and clear order was entered"). On direct appeal to the Second Circuit, New GM renewed the argument, but it did not carry the day there either. (*See* Docket No. 3914-4). Admittedly, the Second Circuit did not explicitly address the argument in its

decision. But its holding — that Plaintiffs were deprived of due process and, thus, are not barred by the Sale Order from bringing successor liability claims against New GM — *presumes* that Plaintiffs have a property interest in their claims against New GM. *See, e.g.*, *Grossman v. Axelrod*, 646 F.2d 768, 770 (2d Cir. 1981) ("It is well-established . . . that a valid liberty or property interest is an essential prerequisite to the successful assertion of due process rights . . . ."). Putting aside whether the Circuit's decision precludes New GM's argument here (based on either or both collateral estoppel and the law-of-the-case doctrine), at a minimum, it underscores that *Tronox* should not be read to extend to those in Plaintiffs' position unless and until the Circuit itself says otherwise.

## B. Choice-of-Law Rules

The Court turns, then, to the question of what law applies to Plaintiffs' successor liability claims. To answer that question, however, the Court must first determine what choice-of-law rules apply. New GM contends, first, that federal choice-of-law rules apply because this case implicates important federal interests and policies (and that those rules call for application of either Delaware or New York law). (Docket No. 3520 ("Def.'s Mem."), at 19-27). In the alternative, New GM contends that New York choice-of-law rules apply because this Court is in New York (and that those rules call for application of either Delaware or New York law). (Docket No. 3857 ("Def.'s Suppl. Mem."), at 1-5; Def.'s Mem. 28-32). By contrast, Plaintiffs argue that the Court must apply the choice-of-law rules of each Plaintiff's home state to that Plaintiff's claims — in other words, that choice-of-law issues must be resolved "on a jurisdiction-by-jurisdiction basis." (Docket No. 3617 ("Pls.' Opp'n"), at 19).

It is well established that when a federal district court sits in diversity, as the Court does here, it must generally apply the law of the state in which its sits — including that state's choice-

of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). That is

because "[t]here is no federal general common law," and state choice-of-law rules are deemed to

be substantive rather than procedural. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938);

*see also Klaxon,* 313 U.S. at 496. It follows that "[t]he ability of the federal courts to create

federal common law and displace state created rules is severely limited." *In re Gaston & Snow,*

243 F.3d 599, 606 (2d Cir. 2001); *see, e.g.*, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410,

422 (2011) ("Absent a demonstrated need for a federal rule of decision, the Court has taken the

prudent course of adopting the readymade body of state law as the federal rule of decision until

Congress strikes a different accommodation." (internal quotation marks and alteration omitted)).

Specifically, federal choice-of-law rules apply only in the rare case where it is "specifically

shown" that there is "significant conflict between some federal policy or interest and the use of

state law." *Atherton v. F.D.I.C.*, 519 U.S. 213, 218 (1997) (internal quotation marks omitted);

*see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) ("[C]ases in which judicial

creation of a special federal rule would be justified . . . . are . . . few and restricted." (internal

quotation marks omitted)).

In this case, New GM falls short of demonstrating, let alone with specificity, that there is

a "significant conflict" between federal policies and interests and the use of state choice-of-law

rules that would call for displacement of those rules by federal choice-of-law rules. *Atherton*,

519 U.S. at 218. First, the Second Circuit has made clear that a generalized "federal interest in

national uniformity" of bankruptcy law does not call for application of federal choice-of-law

rules. *In re Gaston & Snow*, 243 F.3d at 606. Second, the specific circumstances of Old GM's

bankruptcy do not implicate national bankruptcy policy to a degree that would warrant

application of federal choice-of-law rules. Contrary to New GM's assertions (Def.'s Mem. 20-

24), Plaintiffs do not challenge the legitimacy of the Section 363 Sale or any conduct of the

United States Government, Old GM's "good faith purchaser" (which is now fully divested and

out of the picture).  Nor do they challenge (and, in light of the Second Circuit's ruling, do they

need to challenge) any findings of the Bankruptcy Court.

Instead, Plaintiffs merely seek to prevent New GM from enjoying the fruits of carrying

on the business of Old GM without paying the costs associated with that very business.  Even

more significantly, "the underlying rights and obligations" they seek to enforce "are defined by

state law."  *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir. 1992).  That is,

their claims are not "predominantly founded upon state-created rights"; they are *exclusively*

founded upon state-created rights.  *Id.*  In such circumstances, the mere fact that Plaintiffs'

claims relate to a bankruptcy — even a bankruptcy with the national significance that Old GM's

bankruptcy indisputably had — does not provide a basis for this Court to deviate from the

mandate of *Klaxon* and its progeny and substitute federal law for state law on the choice-of-law

question.  *See, e.g.*, *ASARCO LLC v. Americas Min. Corp.*, 382 B.R. 49, 61 (S.D. Tex. 2007), *on

reconsideration in part sub nom.*, 396 B.R. 278 (S.D. Tex. 2008) ("A property interest does not

require the analysis of any federal interest simply because an interested party is involved in a

bankruptcy proceeding." (internal quotation marks omitted)); *Terry v. June*, 420 F. Supp. 2d 493,

502 (W.D. Va. 2006) (applying state choice-of-law rules to claims brought by the receiver in a

Securities and Exchange Commission enforcement action on the ground that they "originate

exclusively in state law and arise in a case which is ancillary to the principal SEC enforcement

action and in which there are no issues of federal law").[2]

---

[2]     It follows that the Court need not resolve the parties' disagreement over whether federal
choice-of-law rules would result in application of Delaware, New York, or Michigan state law.

New GM's alternative argument for avoiding a jurisdiction-by-jurisdiction approach —
that New York choice-of-law principles should apply because this Court sits in New York — is
not without force, but ultimately falls short as well.  Although *Klaxon* generally calls for a
federal court sitting in diversity to apply the law of the state in which its sits, MDL cases are an
exception to that rule.  In MDL cases, "the transferee court must apply the state law that would
have applied to the individual cases had they not been transferred for consolidation."  *In re
Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th
Cir.1996); *see Chang v. Baxter Healthcare Corp.,* 599 F.3d 728, 732 (7th Cir. 2010) ("When a
diversity case is transferred by the multidistrict litigation panel, the law applied is that of the
jurisdiction from which the case was transferred . . . ."); *Toll Bros., Inc. v. Dryvit Sys., Inc.*, 432
F.3d 564, 568 n.4 (4th Cir. 2005) (applying Connecticut state law in a transferred multidistrict
litigation case based on diversity jurisdiction); *see also* 15 Charles Alan Wright & Arthur R.
Miller, *Federal Practice and Procedure* § 3866 (3d ed. 2009).  Applying that rule here would
seem to call for the Court to apply to each named Plaintiff's claim the choice-of-law rules of the
jurisdiction from which that Plaintiff's case was transferred to the MDL.

Would that it were that easy.  Two decisions the Court made early on in the MDL make
the situation a little more complicated.  First, as other MDL courts have done, the Court (with the
consent of New GM) granted permission to plaintiffs to bypass the Judicial Panel on
Multidistrict Litigation transfer process and file directly in this District.  (Docket No. 19 ("Order
No. 1"); Docket No. 249 ("Order No. 8")).  With respect to directly filed cases — and there have
been many — "there technically is no prior proper forum whose choice-of-law rules should
apply."  *Sanchez v. Boston Sci. Corp.*, No. 12-CV-05762 (JRG), 2014 WL 202787, at *3-4
(S.D.W. Va. Jan. 17, 2014).  Nevertheless, when confronted with this "peculiar procedural"

issue, the majority of courts "have stated that it is appropriate to apply the choice-of-law rules of the 'originating' jurisdiction (*i.e.*, where the case would have [been] brought but for the CMO permitting direct filing), rather than the choice-of-law rules of the MDL Court." *Wahl v. Gen. Elec. Co.*, 983 F. Supp. 2d 937, 943 (M.D. Tenn. 2013); *accord In re Watson Fentanyl Patch Prods. Liab. Litig.,* MDL No. 2732, 2013 WL 4564927, at *2 (N.D. Ill. Aug. 27, 2013); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,* 2011 WL 1375011, at *6. The Court agrees with that approach. The Court granted plaintiffs permission to file suit directly in this District solely to reduce transaction costs and promote efficiency, and with the explicit understanding that any such cases would eventually be transferred to the "proper venue." (Order No. 1 § III). The intent (and understanding of all parties involved — including, no doubt, the plaintiffs who took advantage of the permission) was not to alter the substantive law that would have applied in the absence of direct filing.

Second, to facilitate litigation of the economic loss claims, the Court previously ordered Lead Counsel to file a "consolidated complaint," and clarified that the consolidated complaint was the "legally operative" pleading and "supersede[d] individual complaints for purposes of pretrial proceedings (including motion practice)." *In re General Motors LLC Ignition Switch Litigation*, 2015 WL 3619584, at *5, 10-12 (S.D.N.Y. June 10, 2015). (*See also* Docket Nos. 875 and 3826). Indeed, most (but not all) of the underlying complaints have been dismissed in deference to the FACC — albeit without prejudice as to plaintiffs not named in the FACC. *See* 2015 WL 3619584, at *8. Citing those orders, New GM argues that New York law applies because the FACC "was filed in this District." (Def.'s Suppl. Mem. 3). The prevailing view, however, is that "a master complaint" in an MDL should not be used "as the operative pleading for choice of law purposes" unless "the parties have consented to such an arrangement." *In re*

*Conagra Peanut Butter Prods. Liab. Litig.*, 251 F.R.D. 689, 693 (N.D. Ga. 2008). Absent such consent, the use of a consolidated complaint has been treated instead "as a procedural device to streamline the litigation." *In re Takata Airbag Prods. Liab. Lit.*, 193 F. Supp. 3d 1324, 1332 (S.D. Fla. 2016); *accord In re Mercedes–Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 56 (D. N.J. 2009). "Neither the general authorization of the coordination and consolidation under the MDL statute nor the more specific use of consolidated complaints," these courts have observed, "is intended to alter the substantive rights of the parties." *In re Toyota Motor Corp. Unintended Acceleration*, 785 F. Supp. 2d 925, 931 (C.D. Cal. 2011).

In this case, the parties did not consent to treat the FACC (or its predecessors) as the operative complaint for choice-of-law purposes. Additionally, the Court's orders with respect to the consolidated complaint and its opinion explaining those orders were silent on the question of what substantive law would apply. It is true, as New GM notes (Def.'s Suppl. Mem. at 2), that the Court's opinion cited *Gelboim v. Bank of America Corporation*, 135 S. Ct. 897, 904 n.3 (2015), in which the Supreme Court observed in a footnote that parties in an MDL "may elect to file a 'master complaint' and a corresponding 'master answer, which supersede prior pleadings" and that, "[i]n such a case, the transferee court may treat the master pleadings as merging the discrete actions for the duration of the MDL pretrial proceedings." *See* 2015 WL 3619584, at *7. But that statement was *dictum*, and in any event begs the question of what substantive law would apply to such a "master complaint." Indeed, the sole issue in *Gelboim* — whether an order disposing of one member case in an MDL is an appealable final order — was entirely procedural in nature. *See In re Takata Airbag Prods. Liab. Lit.*, 193 F. Supp. 3d at 1332 ("The precise parameters of the [*Gelboim*] Court's dicta in footnote 3 are unclear.").

Thus, the Court concludes that the filing of the consolidated complaint here did not, and does not, affect the substantive law of what choice-of-law rules apply to Plaintiffs' claims. That conclusion is reinforced by the fact that a transfer pursuant to the MDL statute is "for coordinated or consolidated pretrial proceedings" only and that, no later than the conclusion of pretrial proceedings, "[e]ach action so transferred" must be "remanded . . . to the district from which it was transferred unless it shall have been previously terminated." 28 U.S.C. § 1407(a); *see Gelboim*, 135 S. Ct. at 904 n.3 (noting that an MDL court may treat "master pleadings as merging the discrete actions," but only "for the duration of the MDL *pretrial* proceedings" (emphasis added)). Consistent with that limitation, the Court's prior orders made clear that the consolidated complaint was not intended to supersede Plaintiffs' individual actions for all time. (*See* Docket No. 875, at 3-4). *See In re General Motors LLC Ignition Switch Litigation*, 2015 WL 3619584, at *6. That is, the master complaint has a built-in shelf life; absent some sort of consensual resolution of Plaintiffs' claims in this District, the Court will eventually remand each Plaintiff's claims to the district in which he or she first filed those claims (or, absent this Court's direct filing order, would have filed those claims). If or when that happens, it would defy logic — and do violence to *Klaxon*, *Erie*, and Section 1407 — for the transferor courts to apply New York choice-of-law rules rather than the choice-of-law rules of their home states. *See In re Takata Airbag Prods.*, 193 F. Supp. 3d at 1332. It makes no more sense for this Court, tasked with presiding over this MDL for pretrial purposes only, to do differently.

## C. Jurisdiction-by-Jurisdiction Analysis

Accordingly, laborious though it may be, the Court concludes that it must look to the law of each individual jurisdiction at issue to determine what substantive law to apply in assessing

Plaintiffs' successor liability claims.[3]  New GM contends that either the law of Delaware, as the state of New GM's incorporation,[4] or the law of New York, as the state where the Sale was negotiated and executed, should be applied in the vast majority of the jurisdictions.  (Def.'s Mem. 28-32; Docket No. 3656 ("Def.'s Reply"), at 19-22).  By contrast, Plaintiffs assert that the applicable law for Plaintiffs from most of the jurisdictions at issue is either his or her jurisdiction's law or the law of Michigan, as the state where all or most of the conduct giving rise to the alleged injuries occurred.  (Pls.'s Opp'n 17-36).  For the reasons discussed below, the Court's conclusions fall closer to New GM's end of the spectrum than to Plaintiffs', as the Court concludes that Delaware law should be applied in seven of the sixteen jurisdictions at issue.  At the same time, the overall outcome is more mixed than either side would have it.

A mixed outcome is, to some extent, the natural by-product of the country's commitment to federalism.  In addition, however, it is due to the fact that courts have long struggled to determine whether successor liability is a matter of corporate law, contract law, or tort law.  *See, e.g.*, *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 463 (3d Cir. 2006) (Alito, C.J.) (citing cases).  As then-Judge, now-Justice, Alito put it in *Berg*, "[t]he ordinary rule of successor liability is rooted in corporate law, and it states that a firm that buys assets from another firm does not assume the liabilities of the seller merely by buying its assets."  *Id.* at 464.  At the same

---

[3]     Strictly speaking, per the discussion above, the law to be applied is the law of the state from which a case was transferred to the MDL or in which a case would have been filed but for the Court's direct-filing order.  The Court assumes — as the parties have (Def.'s Mem. 28; Pls.' Opp'n 12) — that, for most if not all Plaintiffs, that translates into the law of the Plaintiff's home forum.

[4]     The fact that New GM is a limited liability company, rather than a corporation, does not affect the analysis for choice-of-law purposes.  *See Phillips v. Reed Group, Ltd.*, 955 F. Supp. 2d 201, 228 (S.D.N.Y. 2013).

time, the "[t]he problem of characterization lies in the mottled nature of the exceptions to the ordinary rule in successor liability law because they are not uniformly characterized as wholly based in tort, contract, or corporate law." *Id.* Analyzing the law of each jurisdiction at issue, the Court concludes that different jurisdictions would classify the successor liability claims at issue here differently and that that, in turn, yields different results on the question of choice of law. *See id.* at 463 (noting that "the practical effect of characterizing successor liability may be significant").

### 1. Alabama and Missouri

As an initial matter, the parties actually agree as to Plaintiffs from two of the states at issue: Alabama and Missouri. For each, Plaintiffs contend that the substantive laws of the state apply to whether the successor liability claims may go forward. (Pls.' Opp'n 19-20 (citing *Am. Nonwovens, Inc. v. Non Wovens Eng'g, S.R.L.*, 648 So. 2d 565, 570 (Ala. 1994); *id.* at 28 (citing *Young v. Fulton Iron Works Co.*, 709 S.W. 2d 927, 935-37 (Mo. Ct. App. 1986)). To the extent that federal choice-of-law rules do not apply (as the Court has held), New GM agrees. (Def.'s Mem. 32 n.46; Def.'s Reply 22). Accordingly, the Court will apply Alabama and Missouri law to the claims arising from each of those states. *See also Chumney v. U.S. Repeating Arms Co.*, 196 F.R.D. 419, 423-24 (M.D. Ala. 2000) (applying Alabama law to successor liability claims when the purchaser corporation was incorporated in Massachusetts with a principal place of business in Connecticut); *Gorsuch v. Formtek Metal Forming, Inc.*, 803 F. Supp. 2d 1016, 1021-1022 (E.D. Mo. 2011) (applying Missouri law to successor liability claims when the seller and purchaser corporations were based in Illinois).

## 2. California

By contrast, the parties do not agree on what substantive law applies in the remainder of the jurisdictions, beginning with California. For California (and for many of the other jurisdictions at issue), New GM characterizes Plaintiffs' successor liability claims as alter-ego and veil-piercing claims, with respect to which the law of the state of incorporation is predominantly applied. (Def.'s Mem. 28 n.19 (collecting cases)). Courts applying California choice-of-law rules, however, only depart from the general rule when there is an operative contractual choice-of-law provision, *see Wehlage v. EmpRes Healthcare Inc.*, 821 F. Supp. 2d 1122, 1127 (N.D. Cal. 2011), or the choice of law is dictated by statute, *see id.* at 1128. Otherwise, they apply the "governmental interest" test. *See, e.g.*, *Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No. 05-CV-553 (MHP), 2005 WL 1876106, at *3 (N.D. Cal. Aug. 8, 2005). Under that test,

> (1) the court examines the substantive laws of each jurisdiction to determine whether the laws differ as applied to the relevant transaction, (2) if the laws do differ, the court must determine whether a true conflict exists in that each of the relevant jurisdictions has an interest in having its law applied, and (3) if more than one jurisdiction has a legitimate interest, the court [must] identify and apply the law of the [jurisdiction] whose interest would be more impaired if its law were not applied. Only if both [jurisdictions] have a legitimate but conflicting interest in applying its own law will the court be confronted with a "true conflict" case.

*Love v. Assoc. Newspapers, Ltd.*, 611 F.3d 601, 610 (9th Cir. 2010) (ellipses omitted). The "burden is with the proponent of foreign law" to show that that rule will "further the interests of that state." *CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1142 (9th Cir. 2010).

Here, there is a "true conflict" between the laws of the two jurisdictions that could apply: Delaware (as New GM's state of incorporation) and California (as the state of injury). First, as discussed below, although Delaware recognizes the theories of *de facto* merger and mere

continuation upon which Plaintiffs rely, Delaware courts apply the doctrines "only in very limited contexts" involving fraud or other equitable considerations. *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-CV-0302 (MRP), 2011 WL 1765509, at *3 (C.D. Cal. Apr. 20, 2011); *accord Binder v. Bristol-Myers Squibb, Co.*, 184 F. Supp. 2d 762, 769 (N.D. Ill. 2001). That is materially different from California, which is willing to find *de facto* merger if an asset sale produces the same result as a merger would; if there was inadequate consideration involved; or if one or more persons were officers, directors, or stockholders of both corporations. *See Maine State Ret. Sys.*, 2011 WL 1765509, at *4; *Nat'l Standard Fin. LLC v. Physicians Hosp. of Desert Cities LLC*, No. 13-CV-10 (DTB), 2013 WL 12131185, at *7 (C.D. Cal. May 9, 2013). Second, both states have legitimate interests in having their law applied: Delaware, as the state of New GM's incorporation, and California as the ostensible forum state, as well as the state of purchase, injury, and Plaintiffs' domicile. *See Maine State Ret. Sys.*, 2011 WL 1765509, at *4.

Thus, the dispositive question is which state's "interest would be more impaired if its law were not applied." *Love*, 611 F.3d at 610. That question is close, if only because there is authority pointing in different directions. *Compare, e.g.*, *Maine State Ret. Sys.*, 2011 WL 1765509, at *4 (concluding that the internal affairs doctrine calls for applying the law of the state of incorporation to a question of successor liability), *with Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1102 (E.D. Mich. 1997) (applying the forum state's laws to a question of successor liability on the ground that the issue was one of "external" liability rather than "internal corporate governance"). On balance, however, the Court concludes that, in the circumstances presented here, California courts would follow the "internal affairs doctrine" and apply the law of Delaware to Plaintiffs' successor liability claims. Under that doctrine, codified in Section 302 of the Restatement (Second) of Conflicts of Laws, the law of the state of

incorporation applies where the "parties' dispute involves the internal affairs of the company." *State Farm Mut. Auto. Ins. Co. v. Superior Court*, 114 Cal. App. 4th 434, 442 (2003). Although the successor liability claims here relate to an underlying tort, they themselves are based on the theories of *de facto* merger and mere continuation. "Mergers, reorganizations, and matters that may affect the interests of the corporation's creditors all fall within the scope of Section 302, which prescribes the law of the state of incorporation." *Maine State Ret. Sys.*, 2011 WL 1765509, at *4 (citing Restatement (Second) of Conflict of Laws § 302, cmts. a, e). In short, "because the issue of whether an asset transfer constitutes a *de facto* merger" or triggers the mere continuation exception "is peculiar to corporations, Delaware law applies." *Id.*

### 3. The District of Columbia

In successor liability cases, the District of Columbia employs the "governmental interests analysis" to identify the jurisdiction with the "most significant relationship" to the dispute. *Estate of Thomas v. Southworth, Inc.*, No. 99-CV-712 (CKK), 2001 WL 36383623, at *4 (D.D.C. Jan. 30, 2001) (citing *Hercules & Co. v. Shama Restaurant*, 566 A.2d 31, 40-41 (D.C. 1989)). Under that standard, the Court must "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules*, 566 A.2d at 41. In *Estate of Thomas*, the district court applied that standard to the very issue presented here: "which state's law to apply to determine the presence or absence of successor liability" under D.C.'s choice-of-law rules. 2011 WL 36383623, at *5. The *Thomas* Court concluded that the state of incorporation of the relevant entities was the state with the predominating "significant interest in the governance of its corporate relationships." *Id.* at *5. It is true, as Plaintiffs point out, that the state of incorporation in that case was also the state in which the corporations' principal place of

business was located and the state in which the relevant transactions occurred.  *Id.*  (Pls.' Opp'n 22).  But the court, applying D.C. law, found that the state of incorporation had a significant interest, whereas the state of injury had "little, if any interest," and cited as support a Fifth Circuit case "holding that, under the Restatement's 'most significant relationship' test, successor liability must be determined according to the location of the relationship between the original corporation and the succeeding business entity and not according to the location of the injury."  2011 WL 36383623, at *5 (citing *Webb v. Rodgers Machinery Mfg. Co.*, 750 F.2d 368, 374 (5th Cir. 1985)).  On top of that, D.C. courts abide by an "internal affairs doctrine" much like the one set forth in Section 302 of the Restatement.  *See City of Harper Woods Employees' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009) ("When a claim addresses matters of corporate governance or other internal affairs of a company, D.C. courts apply the law of the state of incorporation.").  Accordingly, the Court will apply Delaware law to the D.C. claims.

### 4. Florida

Unlike D.C., Florida does not appear to have case law directly on point.  As a general matter, Florida courts look to the factors set forth in Section 6 of the Restatement (Second) of Conflict of Laws, which include "the needs of the interstate and international systems," "the certainty, predictability, and uniformity of result," and "the ease in the determination and application of the law to be applied."  Restatement (Second) of Conflict of Laws § 6(2).  *See Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).  Looking only to those factors, a strong argument could be made for the application of either Delaware or Florida law.  What tips the balance in favor of Delaware law, however, are provisions in the Florida Business Corporation Act, which provide that the internal affairs of a corporate entity are governed by the laws of the state of incorporation.  *See* Fla. Stat. Ann. § 607.1505(3) ("This act does not

authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state."); *id.* § 605.0901(1)(a) ("The law of the state or other jurisdiction under which a foreign limited liability company exists governs . . . [t]he organization and internal affairs of the foreign limited liability company."); *see Brown Jordan Int'l, Inc. v. Carmicle*, No. 14-CV-60629 (RLL), 2016 WL 815827, at *45 (S.D. Fla. Mar. 2, 2016), *aff'd*, 846 F.3d 1167 (11th Cir. 2017). Additionally, Florida follows Section 302 of the Restatement, which, as discussed above, also provides that the internal affairs of a corporate entity are governed by the laws of the state of incorporation. *See* Restatement (Second) of Conflict of Laws § 302; *Mukamal v. Bakes*, 378 F. App'x 890, 897 (11th Cir. 2010). Accordingly, as with California and D.C., the Court will apply Delaware law to the Florida claims.

### 5. Illinois

Under Illinois choice-of-law rules, successor liability — even where it is premised on a tort claim — is characterized as a matter of corporate law, "to which Illinois courts apply 'the most significant contacts test.'" *Arachnid, Inc. v. Valley Recreation Prod., Inc.*, No. 98-CV-50282 (PGH), 2001 WL 1664052, at *12 (N.D. Ill. Dec. 27, 2001) (citing *Ruiz v. Blentech Corp.*, 89 F.3d 320, 324 (7th Cir. 1996)); *see also Ruiz*, 89 F.3d at 324-26 (noting that Illinois courts adhere to the principle of *depecage*, pursuant to which courts must conduct separate choice-of-law analyses for successor liability and for the underlying claims). *But see Kramer v. Weedhopper of Utah, Inc.*, 562 N.E.2d 271, 276 (1990) ("Successor corporate liability is determined under the choice-of-law provisions for products liability-traditional tort law.").[5] In

---

[5]     Although Illinois has adopted an internal affairs doctrine, it seems to apply only "[w]hen the subject is liability of officers and directors *for their stewardship of the corporation*."

doing so, courts consider, among other factors, the location of the relevant transaction, the state

of incorporation, and the corporation's principal place of business. *See Flexicorps, Inc. v.*

*Benjamin & Williams Debt Collectors, Inc.*, No. 06-CV-3183, 2007 WL 3231425 (VMK), at *3

(N.D. Ill. Oct. 30, 2007). Given the number of factors, the test can obviously yield different

results (even in cases that might appear similar at first glance), but Illinois courts appear

consistently to apply the law of the state of the corporation's principal place of business. *See,*

*e.g.*, *Ruiz*, 89 F.3d at 326 (applying California law to successor liability claims when both entities

were incorporated in California and had their principal places of business there); *Ryan Beck &*

*Co. v. Campbell*, No. 02-CV-7016 (MEA), 2003 WL 21697364, at *1 (N.D. Ill. July 18, 2003)

(applying New York law as the location of the transaction and principal place of business);

*Arachnid, Inc.*, 2001 WL 1664052, at *12 (disagreeing with the contention "that the place of

incorporation provides the most significant contact" and stating: "On the contrary, the principal

place of business is important."). Taking heed from these decisions, the Court concludes that the

law of Michigan, the principal place of business for both Old GM and New GM, applies to the

Illinois claims.

### 6. Louisiana

Louisiana's choice-of-law provisions, set forth in the state's Civil Code, dictate

application of the law of the state whose "policies would be most seriously impaired if its laws

were not applied to that issue." L.A. Civ. Code art. 3515. "That state is determined by

evaluating the strength and pertinence of the relevant policies of all involved states in light of:

---

*Foodcomm Int'l v. Barry*, 463 F. Supp. 2d 818, 830 (N.D. Ill. 2006); *accord Kellers Sys., Inc. v.*
*Transp. Int'l Pool, Inc.*, 172 F. Supp. 2d 992, 999 (N.D. Ill. 2001).

(1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state." *NorAm Drilling Co. v. E & PCo Int'l, LLC*, 131 So. 3d 926, 928-29 (La. App. 2d Cir. 2013). Courts applying this provision have regularly found the state of incorporation to be the one whose policies would be "most seriously impaired" in cases involving corporate veil-piercing, separateness, and structure, including successor liability claims. *See Energy Coal v. CITGO Petroleum Corp.*, 836 F.3d 457, 463 (5th Cir. 2016) (internal quotation marks omitted) (collecting cases); *see also Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 649 (5th Cir. 2002) (applying the law of the state of incorporation to corporate veil-piercing and successor liability claims in one breath). Plaintiffs do not dispute that proposition, but contend that this is a "delictual" or "quasi-delictual" action that raises "issues of loss distribution and financial protection" and, thus, that the specific-conflict articles of the Civil Code apply instead. (Pls.' Opp'n 24 n.23). Under those articles, Louisiana law applies to tort claims if both parties are domiciled in Louisiana. *See* L.A. Civ. Code arts. 3548, 3542. A business based outside Louisiana but "doing business in Louisiana," like Old GM or New GM, is considered to be a domiciliary for torts arising out of that business under certain circumstances.

Contrary to Plaintiffs' contentions, however, Louisiana state courts analyzing whether successor liability claims could go forward have likened those claims to corporate reorganization claims rather than tort claims. *See e.g.*, *Monroe v. McDaniel*, 16-CA-214, 207 So. 3d 1172, 1180 (La. App. 5 Cir. December 17, 2016); *J.D. Fields & Co. v. Nottingham Const. Co., LLC*, 2015-0723, 184 So. 3d 99, 101 (La. App. 1 Cir. 2015). In the face of that precedent, it is noteworthy

that Plaintiffs do not cite even one case in support of their assertion that the "delictual and quasi-delictual" choice-of-law articles should apply in lieu of Article 3515 here.  (Pls.' Opp'n 24 n.23).  Given the absence of any sign from the state judiciary or legislature that the claims here should be characterized as tort claims, the Court concludes that Delaware law should be applied to the claims arising out of Louisiana.

### 7.  Maryland

Unlike Louisiana, Maryland apparently adheres to the doctrine of *lex loci delicti* in the successor liability context when the underlying claims arise in tort.  *See, e.g.*, *Century Metal Recycling Private Ltd. v. Metal Worldwide, Inc.*, No. 12-CV-2650 (JKB), 2013 WL 4851696, at *5 (D. Md. Sept. 10, 2013) ("[W]hen a Maryland state court is confronted with multistate tort litigation, that court must apply the law of the place of injury as to all matters of substantive law."); *Superior Bank, F.S.B. v. Tandem Nat. Mortg., Inc.*, 197 F. Supp. 2d 298, 313 (D. Md. 2000), *adhered to on denial of reconsideration* (June 27, 2000) (applying Maryland law to successor liability claims with no discussion of the state of incorporation); *Rafael v. Hurst Performance, Inc.*, 793 F. Supp. 116, 118 (D. Md. 1992) (same); *see also Acad. of IRM v. LVI Envtl. Servs., Inc.*, 687 A.2d 669, 677-678 (Md. 1997) (applying Maryland law when the relevant entities were both incorporated in Pennsylvania); *Smith v. Navistar Int'l Transp. Corp.*, 737 F. Supp. 1446, 1449 (D. Md. 1988) (applying Maryland law to a Delaware corporation); *EHA Consulting Grp., Inc. v. Hardin & Assocs., P.C.*, No. 09-CV-2859 (RDB), 2010 WL 1137514, at *3 (D. Md. Mar. 19, 2010) (applying Maryland law to an LLC organized under Michigan law). New GM's only argument to the contrary — that "piercing the corporate veil theories are governed by the law of the state of incorporation" (Def.'s Mem. 29 n. 24 (citing *Meisel v. Ustaoglu*, 2000 WL 33374486 (AW), at *4 (D. Md. Mar. 31, 2000)) — is uncompelling in light

29

of the aforementioned authority. Moreover, while the common-law internal affairs doctrine has been applied in Maryland, it has been limited to "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders." *Tomran, Inc. v. Passano*, 891 A.2d 336, 346 (2006). Accordingly, Maryland law will be applied to the claims of Plaintiffs from Maryland.

### 8. Massachusetts

Massachusetts has adopted a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985); *Shinberg v. Bruk*, 875 F.2d 973, 975 (1st Cir. 1989). Applying that approach, courts that have addressed the choice of law in the successor liability context appear to be split on whether the state of incorporation or the state of injury has more relevance. *See, e.g.*, *Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 557 (2008) (applying Massachusetts law when the original corporation was incorporated in Massachusetts and the alleged successor was a Delaware limited liability company); *Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1447-49 (1st Cir. 1995) (applying Rhode Island law when both entities were incorporated in Rhode Island and the injury took place in Massachusetts); *Cruz v. Boston Litig. Sols.*, No. 13- CV-11127 (LTS), 2016 WL 8730601, at *5 (D. Mass. May 20, 2016) (applying Massachusetts law to successor liability claims against an LLC organized under Delaware law); *McCarthy v. Litton Indus., Inc.*, 410 Mass. 15, 21-23 (1991) (applying Massachusetts law to a case involving California corporations). Taking into consideration "the contacts relevant to [the] transaction" between Old GM and New GM, the Court finds that application of Delaware law makes more sense under the circumstances presented here. *Santa Maria v. Empire-Ace Insulation Mfg. Corp.*, No. 80-CV-2642 (RWZ), 1985 WL 17645, at *4 (D.

Mass. Apr. 15, 1985)  Massachusetts has no bearing on the contacts relevant to "the transaction," which are limited to the place of incorporation of both entities, the location of the transferred assets, and the headquarters and location of administrative personnel of the entities. *Id*.  By comparison, Delaware has a greater interest because both entities were, and are, incorporated under Delaware law.  *Carreiro*, 68 F.3d at 1448.[6]  Accordingly, Delaware law will be applied to the claims arising from Massachusetts.

**9.  Michigan**

Courts applying Michigan law have held that successor liability claims are governed by tort choice-of-law rules, not the rules governing matters of corporate internal affairs.  *See, e.g.*, *Chrysler*, 972 F. Supp. at 1103 (finding that Michigan law would apply to claims brought under a federal statute under either the Michigan choice-of-law rules or federal common law); *Korzetz v. Amsted Industries, Inc.,* 472 F. Supp. 136, 142 (E.D. Mich. 1979) (confirming that a successor liability claim had a "tortious characterization" for conflict of law purposes).  In tort cases, Michigan courts employ a presumption that forum law applies unless there is a "rational reason to do otherwise."  *Sutherland v. Kennington Truck Service, Ltd.*, 454 Mich. 274, 286 (1997).  To determine whether a Michigan court has a "rational reason" to displace Michigan law, courts use a two-part test.  *Id.*  First, the Court must determine whether any other state has an interest in having its law applied to the case.  *Id.*  "If no state has such an interest, the presumption that Michigan law will apply cannot be overcome."  *Id.*  "If a foreign state does have an interest in

<hr />

[6]      Plaintiffs understandably argue that the law of Michigan, as the location of GM's headquarters and the "bulk of the assets purchased by New GM," should apply, taking into consideration the relevant contacts.  (Pls.' Opp'n 26).  But the case law applying Massachusetts law clearly narrows the choice to Massachusetts and Delaware.

having its law applied, [the Court] must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests." *Id.* (citing *Olmstead v. Anderson,* 428 Mich. 1, 24, 29-30 (1987)). In this case, New GM does not contend that Delaware has an interest in having its law applied. (Def.'s Mem. 31 n.37). New GM does attempt to make a case for applying New York law, on the basis of the Sale Order and Sale Agreement. (Def.'s Mem. 30-31; Def.'s Reply 21). But, as discussed above, the claims at issue do not challenge the validity of the Sale or arise from the Sale Agreement. Accordingly, Michigan law will be applied to the claims arising out of Michigan. *See Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 694 (6th Cir. 2013).

### 10. New York

New York courts conduct an "interest analysis" to determine what state's laws should apply to successor liability claims. *See Hayden Capital USA, LLC v. Northstar Agri Indus., LLC*, No. 11-CV-594 (DAB), 2012 WL 1449257, at *6 (S.D.N.Y. Apr. 23, 2012). "Interest analysis is a 'flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.'" *Finance One Public Co. Lmtd. V. Lehman Brothers Special Financing*, 414 F.3d 325, 337 (2d Cir. 2005) (quoting *Cooney v. Osgood Mach., Inc.,* 81 N.Y.2d 66, 72 (1993)). "The contacts of the parties and occurrences with each jurisdiction are thus factors to be considered in applying interest analysis, together with the policies underlying each jurisdiction's rules, the strength of the governmental interests embodied in these policies, and the extent to which these interests are implicated by the contacts." *Id.* Applying that analysis, courts in New York have generally held that successor liability claims are governed by the law of the state of incorporation. *See, e.g.*, *Energy*

*Intelligence Grp., Inc. v. Cowen & Co., LLC*, No. 14 CIV. 3789 (NRB), 2016 WL 3939747, at

*11 (S.D.N.Y. July 15, 2016) ("Under the internal affairs doctrine, issues involving the rights

and liabilities of a corporation are generally governed by the law of the state of incorporation,

based on the rationale that corporations are creatures of the state and are intentionally

incorporated in a particular place in order to organize their liabilities."); *Tommy Lee Handbags*

*Mfg. Ltd. v. 1948 Corp.*, 971 F. Supp. 2d 368, 378 (S.D.N.Y. 2013) ("As with piercing the veil,

New York courts determining successor liability have similarly concluded that the state with the

most interest is the defendant corporation's place of incorporation."); *Planet Payment, Inc. v.*

*Nova Info. Sys., Inc.*, No. 07-CV-2520 (CBA) (RML), 2011 WL 1636921, at *7 (E.D.N.Y. Mar.

31, 2011) (finding defendant's place of incorporation dispositive for successor liability choice of

law analysis); *Soviet Pan Am Travel Effort v. Travel Comm., Inc.*, 756 F. Supp. 126, 131

(S.D.N.Y. 1991) (finding that a successor liability claim, like a veil-piercing claim, implicates

questions of corporate liability for the acts of others, and that the state of incorporation has the

greater interest in such claims).

      Plaintiffs acknowledge this precedent, but nonetheless ask the Court to apply Michigan

law based on the fact that Michigan is (1) the domicile of Old and New GM, (2) the conduct

giving rise to Plaintiffs' claims "emanated" from Michigan, and (3) Delaware has no connection

to Plaintiffs' claims. (Pls.' Opp'n 29-30). In doing so, they rely primarily on *Lippens v. Winkler*

*Backereitechnik GMBH*, 138 A.D.3d 1507, 1509 (N.Y. App. Div.), *reargument denied*, 141

A.D.3d 1124 (N.Y. App. Div. 2016), in which the Fourth Department applied New York law to

successor liability claims brought by a New York resident against a German company. But that

decision rested largely on principles of comity, not choice of law. *See id.* at 1509 (rejecting the

argument that "comity requires the application of German bankruptcy law" and noting that "[i]t

33

is well settled that laws of foreign governments have extraterritorial jurisdiction only by comity"). The *Lippens* Court did invoke "choice of law principles" as well, but its discussion was *dictum. See id.* Accordingly, the Court finds more persuasive the authority cited by New GM applying the law of the state of incorporation to successor liability claims. *See, e.g.*, *SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.*, No. 12-CV-7280 (ALC), 2013 WL 5366373, at *13 (S.D.N.Y. Sept. 25, 2013) ("As with piercing the veil, New York courts determining successor liability have similarly concluded that the state with the most interest is the defendant corporation's place of incorporation."). *But see Semenetz v. Sherling & Walden, Inc.*, 7 N.Y.3d 194, 198-99 (N.Y. 2006) (applying New York law to successor liability claims against an Alabama corporation without any choice-of-law discussion); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 965 N.Y.S.2d 284, 296 (N.Y. Sup. Ct. 2013) (referencing the parties' domiciles rather than the state of defendant's incorporation for conflicts purposes). Accordingly, Delaware law will be applied to the New York claims.

**11. Oklahoma**

Like Florida, Oklahoma applies the "most significant relationship" test from Section 145 of the Restatement (Second) of Conflict of Laws to determine the law applicable to an issue. *See Graves v. Mazda Motor Corp.*, 598 F. Supp. 2d 1216, 1218 (W.D. Okla. 2009). Under that test, Plaintiffs have a strong argument that their successor liability claims are governed by Oklahoma law as the place where the injury occurred and where the Oklahoma Plaintiffs are domiciled. (Pls.' Opp'n 30-31). Moreover, unlike in Florida, there is no state-based internal affairs doctrine, and no indication that Oklahoma courts have adopted (or would adopt) Section 302 of the Restatement. *But see Tomlinson v. Combined Underwriters Life Ins. Co.*, No. 08-CV-259 (TCK) (FHM), 2009 WL 2601940, at *2 (N.D. Okla. Aug. 21, 2009) (finding that Oklahoma

courts had not addressed application of Section 307 of the Restatement (Second) to veil-piercing claims, but applying it based on the fact that they had followed other provisions). In fact, Oklahoma courts have uniformly applied Oklahoma law to successor liability claims, even when the corporations were organized under the laws of different states. *See e.g.*, *Flores v. U.S. Repeating Arms Co.*, 19 F. App'x 795, 797 (10th Cir. 2001) (applying Oklahoma law to successor liability claims involving Connecticut and Massachusetts corporations); *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991) (applying Oklahoma law to claims involving Nebraska corporations); *Crutchfield v. Marine Power Engine Co.*, 209 P.3d 295, 298 (O.K. 2009) (applying Oklahoma law to successor liability claims involving corporations that were all domiciled and incorporated in other states); *Pulis v. United States Elec. Tool Co.*, 561 P.2d 68, 69 (O.K. 1977) (applying Oklahoma law to successor liability claims against an Ohio corporation); *Doyle v. New Werner Holding Co.*, 307 P.3d 405, 408-09 (O.K. Civ. App. 2013) (applying Oklahoma law to successor liability claims against a Pennsylvania corporation).[7] In the face of that precedent, New GM's generic argument that the claims should be treated as analogous to veil-piercing claims falls flat. (Def.'s Mem. 29 n.26). Accordingly, Oklahoma law will be applied to the claims arising from Oklahoma.

---

[7] The only two Oklahoma cases in which the law of the state of incorporation appears to have been applied did so because the parties had consented to application of that law. *See Oklahoma ex rel. Doak v. Acrisure Bus. Outsourcing Servs., LLC*, 529 F. App'x 886, 893 (10th Cir. 2013) (upholding the application of Michigan law to successor liability claims involving Michigan corporations, where parties did not object to its application in the district court); *Oklahoma v. Montgomery*, No. 11-CV-863 (RJC), 2012 WL 12864334, at *2 (W.D. Okla. May 24, 2012) ("Oklahoma has not enumerated a choice of law rule regarding successor liability claims. However, Defendants contend that Michigan law applies, and Plaintiff seemingly concedes to that finding."), *aff'd sub nom. Oklahoma ex rel. Doak v. Acrisure Bus. Outsourcing Servs., LLC*, 529 F. App'x 886 (10th Cir. 2013).

### 12. Pennsylvania

As noted above, then-Judge Alito observed that "the practical effect" of how a successor liability claim is "characteriz[ed]" can be "significant." *Berg Chilling Sys., Inc.*, 435 F.3d at 463. Analogizing Plaintiffs' successor liability claims to veil-piercing and shareholder liability claims, New GM contends that Delaware law should apply. (Def.'s Mem. 29 n.27; Def.'s Reply 21). But for the reasons set forth in *Berg Chilling System*, the Court concludes that Pennsylvania courts would "look to the substance of the transaction" when it comes to Plaintiff's implied-warranty-related successor liability claims, and thus characterize those claims as rooted in contract law. 435 F.3d at 466-67. And for the reasons set forth in the persuasive opinion of the United States District Court for the Eastern District of Pennsylvania in *Van Doren v. Coe Press Equip. Corp.*, 592 F. Supp. 2d 776, 784-85 (E.D. Pa. 2008), the Court concludes that Pennsylvania courts would characterize Plaintiffs' remaining successor liability claims as based in tort law. *See also Kradel v. Fox River Tractor Co.*, 308 F.3d 328 (3d Cir. 2002) (treating a tort-based successor liability claim as a matter of tort law, not corporate law). For both kinds of claims, Pennsylvania follows a "flexible rule" that "permits analysis of the policies and interests underlying the particular issue before the court." *Berg Chilling Sys., Inc.*, 435 F.3d at 463 (quoting *Griffith v. United Air Lines*, 203 A.2d 796, 805 (1964)); *see also Van Doren*, 592 F. Supp. 2d at 784-85 (noting that "a court applying Pennsylvania law should use the Second Restatement of Conflict of Laws as a starting point, and then flesh out the interest using an interest analysis" (quoting *Berg*, 435 F.3d at 463)).

Relevant contacts in a contract case include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, (e) the domicil, residence, nationality, place of incorporation and place of business

of the parties." *Berg Chilling Sys., Inc.*, 435 F.3d at 467 (quoting Restatement (Second) of Conflict of Laws § 188(2)). Relevant contacts in a tort case include "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Van Doren*, 592 F. Supp. 2d at 785 (quoting Restatement (Second) of Conflict of Laws § 145)). The Court finds that the weight of these factors, considered qualitatively rather than quantitatively, *see id.* at 785-86, favor application of Pennsylvania law to Plaintiffs' successor liability claims. For instance, the injury in this case occurred in Pennsylvania, the contract from which the implied warranty claims arise was negotiated and performed in Pennsylvania, and Pennsylvania is the place of Plaintiffs' domicile. (Pls.' Opp'n 32). As *Berg* and *Van Doren* make clear, Pennsylvania courts have generally applied their own law in similar circumstances. *See, e.g.*, *Berg Chilling Sys.*, 435 F.3d at 468; *Van Doren*, 592 F. Supp. 2d at 786-87; *cf. Jones v. Se. Pa. Transp. Auth.*, No. 91-CV-7179, 1993 WL 141646, at *7 (E.D. Pa. Apr. 30, 1993) ("[B]ecause the plaintiff was neither a citizen nor a resident of Pennsylvania, the interest of Pennsylvania in compensating its residents and domiciliaries for injuries is not implicated."). As the *Van Doren* court put it with respect to tort-based claims, "Pennsylvania's interest in protecting its citizens against defective products will be greatly hindered if it is unable to hold out-of-state successor corporations liable for injuries suffered by its citizens resulting from accidents occurring within the state." *Van Doren*, 592 F. Supp. 2d at 786. Accordingly, the Court will apply Pennsylvania law to these claims.

**13. Texas**

Texas has also adopted an issue-specific "most significant relationship" test. *Gutierrez v. Collins*, 583 S.W.2d 312, 319 (Tex. 1979); *see White v. Cone-Blanchard Corp.*, 217 F. Supp. 2d

767, 770-71 (E.D. Tex. 2002) (finding that "the court must apply the most significant relationship test for each issue"). Thus, rather than looking to the law governing the underlying tort claims, Texas courts consider other factors, including: the place of incorporation and principal place of businesses of both entities, the place of purchase, and the location of the assets purchased. *See White*, 217 F. Supp. 2d at 771. Plaintiffs contend that these factors warrant application of Michigan law, as the principal places of business of both Old and New GM and the location of the "bulk" of the purchased assets. (Pls.' Opp'n 33-34). In arguing otherwise, New GM contends that Texas choice-of-law rules use the state of incorporation for veil-piercing and alter ego claims; alternatively, New GM asserts that New York law should govern in light of the choice-of-law provision in the Sale Agreement (which was also negotiated in New York). (Def.'s Mem. 29 n.28; Def.'s Reply 20). The Court agrees New GM's alternative argument.

"Under Texas law, the buying and selling corporations' purchase agreement's choice of law provision controls the applicability of successor liability doctrines." *Ford, Bacon & Davis, LLC v. Travelers Ins. Co.*, No. 08-CV-2911, 2010 WL 1417900, at *5 (S.D. Tex. Apr. 7, 2010), *aff'd sub nom. Ford, Bacon & Davis, L.L.C. v. Travelers Ins. Co.*, 635 F.3d 734 (5th Cir. 2011). Here, the Sale Agreement, which is the "the central focus of the successor liability inquiry" according to Texas courts, explicitly provides that the sale is governed by New York law (to the extent the Bankruptcy Code does not apply). *Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 853 (W.D. Tex. 2017). (*See* Def.'s Mem. 27; Pls.' Opp'n 34 n.38). The weight of authority provides that that choice is controlling under Texas law. *See, e.g.*, *Brickley*, 566 B.R. at 853-54 (finding the choice-of-law provision in an asset purchase agreement determinative, even when some of the relevant entities were incorporated or domiciled in other states); *White*, 217 F. Supp. 2d at 771 (finding that Vermont

law applied to the issue of successor liability because the purchase agreement made Vermont law the choice of law that would govern the agreement); *Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 133-34 (Tex. App. 2000) (applying Delaware law to successor liability where the purchase and sale agreement specified Delaware in its choice-of-law provision and where Delaware had "a reasonable relationship to the sale of [the predecessor's] assets"). Accordingly, New York law will be applied to the claims arising from Texas.

### 14. Virginia

The Virginia Supreme Court has never ruled on whether successor liability is an issue of tort or contract. *See Ambrose v. Southworth Prod. Corp.*, 953 F. Supp. 728, 734 (W.D. Va. 1997); *Ryder Truck Rental, Inc. v. UTF Carriers, Inc.*, 790 F. Supp. 637, 641 (W.D. Va. 1992). Plaintiffs contend (Pls.' Opp'n 34), and New GM does not dispute, that if their successor liability claims are characterized as tort claims, the doctrine of *lex loci delicti* would apply and call for application of Virginia law. *See Ryder Truck Rental, Inc.*, 790 F. Supp. at 641. Similarly, Plaintiffs do not dispute that if their successor liability claims are characterized as contract claims, Virginia calls for application of "the law of the place where the contract was made" — here, New York. *Id.* (*See* Def.'s Mem. 32). As Plaintiffs acknowledge (Pls.' Opp'n 34 n.40), the one other court to confront the proper characterization of claims like those here under Virginia law found that they sound in contract rather than tort because the main inquiry is "an analysis of the relationship between two corporate parties and the agreements undertaken by those parties." *Ambrose*, 953 F. Supp. at 734. It is true, as Plaintiffs argue, that that decision is "non-binding" here. (Pls.' Opp'n 34 n.40). It is also true that this Court found *Ambrose* "unpersuasive in another context" (*id.*) — namely, with respect to whether Virginia would recognize a post-sale duty to warn. *See In re: Gen. Motors LLC Ignition Switch Litig.*, 202 F.

Supp. 3d 362, 366 (S.D.N.Y. 2016). But the reasons for the Court's rejection on that occasion —

namely, that the court "ignore[d] that a federal court's duty where a state's highest court has not

ruled on an issue is to predict how that court would rule on it," *id.* — do not apply here; in its

choice-of law analysis, the *Ambrose* court took pains to determine whether successor liability

claims of the sort at issue here would fall within the "settled meaning" of torts or contracts under

Virginia law, persuasively concluding that they were "contractual in nature." *Ambrose*, 953 F.

Supp. at 734. Accordingly, New York law will be applied to the claims from Virginia.

### 15. Wisconsin

Finally, in Wisconsin, the "first rule" in the choice-of-law analysis is "that the law of the

forum should presumptively apply unless it becomes clear that non-forum contacts are of the

greater significance." *State Farm Mutual Automobile Insurance Co. v. Gillette,* 641 N.W.2d

662, 676 (Wis. 2002). If it is not clear that the non-forum contacts are of greater significance,

then a court must consider five choice-influencing factors: "(1) Predictability of results; (2)

Maintenance of interstate and international order; (3) Simplification of the judicial task; (4)

Advancement of the forum's governmental interests; and (5) Application of the better rule of

law." *Id.* at 588-89; *see also Heath v. Zellmer*, 151 N.W.2d 664 (Wis. 1967). In *A.B. Data,*

*Limited v. Graphic Workshop Inc.*, 621 N.W.2d 386 (Wis. Ct. App. 2000), the Wisconsin Court

of Appeals applied those factors to conclude that the law of New York — as the state of

incorporation — should apply to successor liability claims arising out of a breach of contract in

Wisconsin. Specifically, the Court found that the first four factors favored application of New

York law: it would lead to more predictability for corporations, provide the best chance for

maintaining order, simplify the judicial task, and further governmental interests by assuring that

the law of the state of incorporation would control such disputes. *Id.* Although the fifth factor

favored Wisconsin law, the Court found that, "balancing . . . all the factors results in a conclusion that New York law should apply to the limited issue of whether [the successor] is liable for [the predecessor's] debts as a successor corporation." *Id.* In light of that analysis, which the Court finds persuasive, Delaware law will be applied to the Wisconsin Plaintiffs' claims. *Cf. Smith v. Meadows Mills, Inc.*, 60 F. Supp. 2d 911, 915 (E.D. Wis. 1999) (finding Wisconsin law applied when the only connection to North Carolina was that the faulty product was manufactured there and the asset purchase agreement, to which the plaintiff was not a party, was negotiated there).

## D. The Merits

With that, the Court can finally turn to the merits of New GM's arguments for summary judgment with respect to Plaintiffs' successor liability claims. Two considerations, however, give the Court pause. First, as noted above, the parties have advised the Court that Plaintiffs are close to reaching a settlement with the GUC Trust concerning their motion to bring late-filed claims against the Trust. (*See, e.g.*, Docket No. 4174). The parties disagree about whether and to what extent such a settlement (or the mere prospect of such a settlement) would have an impact on the viability of Plaintiffs' successor liability claims under whatever laws apply. (Docket No. 4275 ("July 13, 2017 Jt. Ltr.")). What is clear, however, is that the parties have not briefed the issue in any meaningful way, let alone with reference to the state laws that the Court has found to be applicable. Second, relative to (and perhaps because of) the amount of ink both sides spill on the choice-of-law issues, the parties devote little attention in their briefs to the merits under each state's law; for most states, discussion of the merits spans no more than one or two pages. (Def.'s Mem. 39-43, 47-50, 51-53, 55-58; Pls.' Opp'n 42-68; *see* July 13, 2017 Jt. Ltr. 1). Given both of those considerations, and notwithstanding the Court's general desire to avoid any delay, the Court concludes that further briefing on the merits is in order.

That said, the Court does not believe that further briefing on the merits under Delaware law is necessary. For one thing, the parties give more attention to briefing the merits under Delaware law than they do to briefing the merits under any other state law — no doubt because of New GM's efforts to persuade the Court that Delaware law should apply across the board. (Def.'s Mem. 34-36; Pls.' Opp'n 49-50). Second, upon review of Delaware law, the Court concludes that the issue is not even close and that a settlement between Plaintiffs and the GUC Trust would have no effect whatsoever on the Court's analysis or conclusions. Thus, the Court turns to the parties' arguments on the merits under Delaware law, which applies to Plaintiffs' claims in seven jurisdictions at issue in this motion: California, the District of Columbia, Florida, Louisiana, Massachusetts, New York, and Wisconsin.

As a general matter, the rule in Delaware (as in most, if not all, states) is that "where one company sells or otherwise transfers all of its assets to another company, the latter is not liable for the debts and liabilities of the transferor, including those arising out of the former's tortious conduct." *Fehl v. S.W.C. Corp.*, 433 F. Supp. 939, 945 (D. Del. 1977); *accord Fountain v. Colonial Chevrolet Co.*, No. 85C-DE-88 (VAB), 1988 WL 40019, at *7 (Del. Super. Ct. Apr. 13, 1988). "[I]n some limited circumstances," however, "where an avoidance of liability would be unjust, a purported sale of assets . . . may be found to transfer liabilities of the predecessor corporation." *Fehl*, 433 F. Supp. at 945. Specifically, Delaware recognizes four exceptions to the general rule against successor liability: "(1) the purchaser expressly or impliedly assumes such obligations; (2) the transaction amounts to a consolidation or merger of the seller into the purchaser; (3) the purchaser is merely a continuation of the seller; or (4) the transaction has been entered fraudulently." *Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 540 (D. Del. 1988); *see also Knapp v. North American Rockwell Corp.*, 506 F.2d 361, 363-64 (3d Cir. 1974). Here,

Plaintiffs rely on only one of these exceptions: the third, or "mere continuation," exception. (*See*

Pls.' Opp'n 49-50; *see also id.* at 37 n.44; Docket No. 3633, at 1 & n.4).[8]

Significantly, the mere continuation theory of successor liability "has been narrowly

construed by the Delaware courts." *Magnolia's at Bethany, LLC v. Artesian Consulting*

*Engineers, Inc.*, No. S11 C-04-013 (ESB), 2011 WL 4826106, at *3 (Del. Super. Ct. Sept. 19,

2011); *accord Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 397 (D. Del. 2012). Specifically,

the exception applies only if the purchaser is the "same legal person [as the former corporation],

having a continued existence under a new name." *Fountain*, 1988 WL 40019, at *9. Notably,

"[t]he test is not the continuation of the business *operation*." *Elmer*, 698 F. Supp. at 542

(emphasis added). Nor is it the continuation of the old entity's product lines. *See Marnavi*, 900

F. Supp. 2d at 397. Instead, the test is "the continuation of the corporate *entity*." *Elmer*, 698 F.

Supp. at 542 (emphasis added). Furthermore, "[i]mposition of successor liability is only

appropriate where the new entity is so dominated and controlled by the old company that

separate existence must be disregarded." *AJZN, Inc. v. Yu*, No. 13-CV-149 (GMS), 2015 WL

---

[8] In four of the states at issue here, Plaintiffs also rely on the "*de facto* merger" exception. (*See* Docket No. 3633, at 1 & n.4 (noting that "Plaintiffs argue for the application of 'de facto merger' liability in only 4 jurisdictions": Alabama, Maryland, New York, and Pennsylvania). They wisely disclaim reliance on the doctrine for purposes of Delaware, where it requires proof of three elements: "(1) one corporation transfers all of its assets to another corporation; (2) payment is made in stock, issued by the transferee directly to the shareholders of the transferring corporation; and (3) in exchange for their stock in that corporation, the transferee . . . [assumes] all the debts and liabilities of the transferor." *Xperex Corp. v. Viasystems Technologies Corp., LLC*, C.A. No. 20582–NC, 2004 WL 3053649, at *2 (Del. Ch. July 22, 2004). Here, none of those elements is satisfied. It is undisputed that Old GM retained sixteen categories of assets under the Sale Agreement and, thus, did not transfer *all* of its assets to New GM (Def.'s 56.1 SUF ¶¶ 38-39); that New GM assumed only certain "debts and liabilities" of Old GM (*id* at ¶¶ 38, 40); and that no payment in shares of New GM stock was issued directly to the shareholders of Old GM (*id.* ¶¶ 41-43). Accordingly, New GM's motion is also granted as to any claims brought under Delaware's *de facto* merger doctrine.

331937, at *15 (D. Del. Jan. 26, 2015) (internal quotation marks omitted).  In evaluating whether

that is the case, Delaware courts consider, among other factors, whether the sale was an arm's-

length, cash transaction; whether the transferor corporation existed after the sale; and whether

there was any continuity of ownership or control.  *See Magnolia's at Bethany*, 2011 WL

4826106, at *3 ("The primary elements of continuation include the common identity of the

officers, directors, or stockholders of the predecessor and successor corporations, and the

existence of only one corporation at the completion of the transfer.").

 Applying those standards here, it is plain that New GM is entitled to summary judgment

on Plaintiffs' successor liability claims under Delaware law.  First, it is undisputed that the sale

of certain of Old GM's assets to the new corporate entity sponsored principally by the U.S.

Treasury was an arm's-length transaction involving fair consideration.  (*See* Def.'s 56.1 SUF

¶¶ 21-26, 29-30; Pls' Opp'n 40).  It is also undisputed that, following the sale, Old GM

continued to exist, as MLC, and retained sixteen categories of assets and certain liabilities.

(Def.'s 56.1 SUF ¶¶ 35, 38, 40, 46).  Indeed, MLC filed a Certificate of Dissolution on

December 15, 2011, after having co-existed with New GM for over two years.  (*Id.* at ¶¶ 45,

47).[9]  And finally, it is undisputed that the Old GM was issued only 10% of New GM's common

stock (and warrants to purchase up to 15%) and that those shares were earmarked for Old GM's

creditors and did not provide for any role in appointing board members; indeed, the majority of

the new company was owned by the U.S. government.  (Def.'s 56.1 SUF ¶¶ 26, 32, 36).[10]  It is

---

[9] There may be some dispute as to what extent the subsequently formed GUC Trust is also a successor to Old GM (Def.'s Reply 7 n.10; Docket No. 3588), but that is neither here nor there for the purposes of Delaware law.

[10] Plaintiffs state that, "[i]f the Court is inclined to grant any portion of New GM's motion," they "request a continuance" on the ground that they have not received "full responses to their

true that six of New GM's thirteen board members had been directors of Old GM too (*id.* ¶ 37); that New GM held itself out in some contexts as the same "General Motors" (Pls.' SUF ¶¶ 40, 49, 53-54, 79, 88-89; *but see* Def.'s 56.1 SUF ¶ 63 (noting that financial statements described New GM as a "new company); *id.* ¶ 33 ("New GM was required for 90 days to include on the home page of its consumer web page a conspicuous disclosure of information about the new entity . . . .")); and that New GM carried on Old GM's "core" automobile brands.  (Pls.' SUF ¶¶ 41-42, 49).  But those facts — even taken together — are not a basis from which a reasonable fact finder could conclude that New GM is the same "legal person" as, and thus a mere continuation of, Old GM.  *See, e.g.*, *Marnavi*, 900 F. Supp. 2d at 397 (holding that the continuation of at least one product line was immaterial where the old company and new company "co-existed" for three years); *Ross v. Desa Holdings Corp.*, No. 05C-05-013 (MMJ), 2008 WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008) ("The retention of five of seven officers and one of six directors does not rise to the level of continuity sufficient to impose successor liability."); *Fountain*, 1988 WL 40019, at *9 (holding that an advertisement in which the defendant held itself out as having been in existence "since 1928" showed "little more than" its "reliance upon the continuing name and goodwill of the purchased business" and was "not evidence" that the company and was "'the same legal person'" as the old company).

---

discovery requests concerning the ownership of stock both before and after the asset sale by key personnel."  (Pls.' Opp'n 68-69; *see* Docket No. 3620, at ¶¶ 2-7).  With respect to Delaware law, that request is denied, as it is immaterial here whether "key personnel" owned stock in both Old GM and New GM.  (*See also* Docket No. 3597 (denying Plaintiffs' motion to compel New GM to produce documents concerning Old GM and New GM stock holdings for fifty-nine specifically named senior officers, managers, and engineers on the ground that "the information sought has limited or no relevance to the issue of successor liability and its disclosure would be unduly intrusive")).

## CONCLUSION

For the reasons stated above, the Court grants New GM's motion for summary judgment with respect to Plaintiffs' successor liability claims in part and reserves judgment on the remainder of the motion.  Specifically, the Court holds that:

- Plaintiffs' claims are not barred by the Second Circuit's decision in *Tronox* because, by virtue of the due process violation, Plaintiffs did not know about, and could not bring, the claims at the time of the bankruptcy;

- Each jurisdiction's choice-of-law rules must be applied to determine the substantive law that governs the merits of Plaintiffs' successor liability claims in that jurisdiction;

- Based on a jurisdiction-by-jurisdiction analysis, Delaware law applies to Plaintiffs' successor liability claims in seven jurisdictions considered here: California, the District of Columbia, Florida, Louisiana, Massachusetts, New York, and Wisconsin.  The applicable law to be applied in the other nine jurisdictions is as follows:

| Claims | Applicable Substantive Law |
|---|---|
| Alabama | Alabama |
| Illinois | Michigan |
| Maryland | Maryland |
| Michigan | Michigan |
| Missouri | Missouri |
| Oklahoma | Oklahoma |
| Pennsylvania | Pennsylvania |
| Texas | New York |
| Virginia | New York |

- Under Delaware law, Plaintiffs' successor liability claims fail as a matter of law, requiring dismissal of those claims in seven of the sixteen states; and

- Additional briefing is warranted on the merits of Plaintiffs' claims in the other nine jurisdictions due to, among other things, the potential settlement between Plaintiffs and the GUC Trust.

Accordingly, the successor liability claims of Plaintiffs from California, the District of Columbia, Florida, Louisiana, Massachusetts, New York, and Wisconsin are dismissed, and the Court reserves judgment on the successor liability claims of Plaintiffs from Alabama, Illinois, Maryland, Michigan, Missouri, Oklahoma, Pennsylvania, Texas, and Virginia. With respect to those nine jurisdictions, the parties shall, no later than **August 24, 2017**, file supplemental memoranda of law, not to exceed **twenty-five pages** in length, addressing the merits (including any effect of the settlement negotiations or potential settlement between Plaintiffs and the GUC Trust, as to which the parties should submit supporting declarations as appropriate).

The Clerk of Court is directed to terminate Docket No. 3519.

SO ORDERED.

Dated: August 3, 2017
       New York, New York

_____
JESSE M. FURMAN
United States District Judge

47